UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHARLET HUDSON,<br><br>    Plaintiff,<br><br>    v.<br><br>CAROLYN W. COLVIN,<br><br>    Defendant. | Case No. 15-cv-04921-MEJ<br><br>**ORDER RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 16, 19 |

## INTRODUCTION

Plaintiff Sharlet Hudson ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a final decision of Defendant Carolyn W. Colvin ("Defendant"), the Acting Commissioner of Social Security, denying Plaintiff's claim for disability benefits.  Pending before the Court are the parties' cross-motions for summary judgment.  Dkt. Nos. 16, 19.  Pursuant to Civil Local Rule 16-5, the motions have been submitted on the papers without oral argument.  Having carefully reviewed the parties' positions, the Administrative Record ("AR"), and relevant legal authority, the Court hereby **REMANDS** the case for further proceedings for the reasons set forth below.

## BACKGROUND

At the time Plaintiff filed the present claim, she was 30 years old.  AR 423.  Plaintiff reported attending high school through the 11th grade and dropped out when she became pregnant, though she later obtained a GED.  AR 576.  She reported last working as a childcare provider for the East Bay Community Recovery Project from 2003 to 2008.  AR 345-46.  Plaintiff reported that her childcare provider job was becoming increasingly stressful, so she decided to return to school and enrolled at the Academy of Art in 2008.  AR 117-18.

In 2009, Plaintiff reported developing numbness and tingling in her hands and feet, and providers at Highland Hospital stated she possibly had Carpal Tunnel Syndrome. AR 667. In May 2009, she reported having an episode of prolonged and uncontrollable shaking, with an acute loss of muscle tone, difficulty walking, and slurred speech. AR 423, 667. Following this, Plaintiff went to the Highland Hospital ER and was later hospitalized at Alta Bates Summit Hospital for a week, where she was given a cane and given a rule out diagnosis of Multiple Sclerosis. AR 667.

A brain MRI conducted in July 2009 showed "non-specific foci of increased T2 signal in the cerebral white-matter." AR 424. A cervical spine MRI that month showed "mild reversal of the cervical curvature but was otherwise normal." *Id.* Cerebrospinal fluid analysis conducted in 2009 yielded normal results, and all other labs were normal. *Id.*

Plaintiff's primary care provider is Kaiser Permanente, where she underwent neurological consultations from 2009-2011, physical therapy in 2010, and treatment and testing for a range of somatic symptoms from 2009 to the present. AR 164-165, 481-526, 630-65, 765-72. Kaiser treatment records associated with the current claim begin on January 10, 2012, where Plaintiff presented with paroxysmal headaches that no longer responded to indomethacin, and nausea. AR 433-34. At that visit, treating physician Dr. Neal Lischner reported Plaintiff has had "extensive neurological work-ups in the past with at least 3 different neurologist[s] consulting," suggested a diagnosis of "somatic dysfunction," and prescribed Clonazepam, a psychiatric medication. AR 436.

A summary of Plaintiff's mental health treatment at Family Paths from February to June 2012 reports that Plaintiff presented as very anxious and in severe pain from various somatic symptoms, but that she stopped taking Clonazepam after learning that it is addictive. AR 428-29.

Plaintiff next visited Kaiser on October 9, 2012, where she complained of body tremors lasting a few minutes, severe headaches, tingling in the back of her right leg, and spasms in her left eye. AR 441. Plaintiff underwent a CT head scan that day, which revealed no acute intracranial pathology. AR 445, 448-49.

On November 19, 2012, Plaintiff underwent a neurological evaluation with Dr. Hans-

Christian Von Buedingen at UCSF, who conducted a physical examination of Plaintiff and reviewed records. AR 423-25. On physical examination, abnormal findings consisted of reduced ankle jerk reflexes bilaterally, a slightly wide-based gait, a slightly insecure tandem walk, and bilateral ataxia. AR 424. Dr. Von Buedingen concluded that the etiology of the patient's symptoms was not clear, but recommended a number of tests, including an EMG, nerve conduction study, MRI, and retinal evaluation. AR 424-25.

Plaintiff visited Kaiser at least 10 times in 2013, presenting with symptoms including severe pain in her eye, gum soreness, alternating sensitivity to heat, hives on her skin when she scratches consistent with dermatographic urticaria, wounds that take excessively long to heal, a painful reaction to a blood draw requiring her to be fit for a sling, and bilateral foot/ankle pain requiring a compression boot, crutches, and a prescription for NSAIDS. AR 465, 467-81, 485-503, 646-62.

On April 18, 2013, treating neurologist Dr. Frank Dustin ordered a battery of tests to evaluate various symptoms based on the recommendations from Dr. Von Buedingen, but reported, "[s]ee extensive past neuro notes and work-up. In my estimation she has somatization [disorder]." AR 515.

On April 17, 2013, a right upper extremity ultrasound revealed no evidence of deep vein thrombosis. AR 524.

An April 22, 2013, ophthalmology evaluation revealed no evidence of retinitis pigmentosa, but Plaintiff was diagnosed with dry eye syndrome. AR 520. A brain MRI conducted on the same day revealed no significant changes from previous findings of non-specific white matter T2 hyperintensity foci. AR 525-26.

Needle EMG and nerve conduction studies on June 5, 2013, revealed no evidence of polyneuropathy. AR 630-39. A right foot x-ray on July 24, 2013, found no significant osseous abnormality, but did note mild forefoot soft tissue swelling. AR 648.

Plaintiff underwent several tests in 2014, including a bilateral hip x-ray, a gynecologic cytology analysis, and an EKG, all of which came back normal. AR 768, 770-71.

Kaiser records include a "History" section that states, "daily walking 2 miles," which Plaintiff contends was later clarified to mean she used to walk "everywhere," but is now limited to walking a half block before she needs to stop. AR 45, 145-47. Kaiser records indicate that Plaintiff's "Patient Active Problem List" also includes anemia, gestational proteinuria, obstructive sleep apnea, GERD, and obesity. AR 434-35.

In addition to Plaintiff's treatment at Kaiser, she underwent four forensic evaluations in connection with her current claim. AR 574-78, 580-83, 666-84.

On May 8, 2013, Plaintiff met with Farah Rana, M.D. for a neurological examination ordered by the State Agency. AR 580. Dr. Rana conducted a physical examination, reviewed Dr. Von Buedingen's neurological assessment from UCSF. AR 580-81. During the examination, no lower back tenderness was noted, range of motion in her lumbosacral spine was within normal limits, and strength was 5/5 with normal muscle bulk and tone. AR 582. Abnormal findings during the physical examination included decreased temperature sensation over Plaintiff's feet, mildly ataxic heel-to-shin testing, slightly wide-based slow gait with the use of a cane, and difficulty with tandem gait. AR 583. Dr. Rana's clinical impression was that Plaintiff presented with a "complex pattern of neurological symptoms" of questionable etiology, and limited Plaintiff to the light exertion level, with the ability to lift/carry 10 pounds frequently and 20 pounds occasionally, and stand or walk less than 6 hours out of an 8-hour workday with breaks, with a cane indicated for ambulation over one to two blocks. AR 583.

On May 9, 2013, Plaintiff met with Carol Fetterman, Ph.D. for a psychological examination ordered by the State Agency. AR 574. Dr. Fetterman conducted a clinical interview, reviewed Dr. Von Buedingen's neurological evaluation, administered the Folstein Mini Mental State Exam. AR 574-76. On the Folstein Mini Mental State Exam, Plaintiff was able to subtract serial threes although she had to count on her fingers. She took one trial to learn three words, and she recalled one out of these three words after a five-minute delay. AR 576. Plaintiff's language, abstraction, and thought process were found to be intact, her judgment and insight limited, and her mood and affect irritable. AR 576-77. Dr. Fetterman diagnosed Plaintiff with Mood Disorder

4

NOS, and determined that she has a mildly limited ability to: understand, remember, and carry out instructions; maintain attention, concentration, persistence, and pace; relate and interact with supervisors, coworkers, and the public; and adapt to day-to-day work activities. AR 577. Dr. Fetterman further found that Plaintiff has a "fair ability to maintain regular attendance in the workplace as mental health symptoms may impact attendance," and a "fair ability to handle normal work related stress . . . as mental health symptoms may impact claimant's ability to handle work-related stress." AR 577.

On July 30, 2014, Plaintiff underwent a psychological evaluation with Lesleigh Franklin, Ph.D. at the request of Plaintiff's representative. AR 675. Dr. Franklin conducted a clinical interview and reviewed Dr. Von Buedingen's neurological evaluation, a confidential psychological report conducted by Dr. Ede Thomsen on April 10, 2012, and treatment records from Family Paths. *Id.* In her review of the records, Dr. Franklin noted that past diagnostic impressions have included Bipolar II Disorder, Bipolar Disorder, Adjustment Disorder with Anxiety, Somatization Disorders and personality disorders. AR 677. Dr. Franklin administered the Repeatable Battery Assessment of Neuropsychological Status ("RBANS"), the Wechsler Abbreviated Scale of Intelligence ("WASI"), the Miller Forensic Assessment of Symptoms Test ("M-FAST"), the Beck Anxiety and Depression Inventories ("BAI" and "BDI"), the Clock Drawing Test, and Trail Making A and B. AR 675.

On the WASI, Plaintiff received a Full Scale IQ score of 84, which placed her in the 14th percentile as compared with other adults in her age group. AR 678. On the RBANS, Plaintiff placed in the 0.2 percentile in the area of immediate memory, the 0.1 percentile in delayed memory, the 0.1 percentile in attention, the 7th percentile in language abilities, and the 1st percentile in visuospatial/constructional abilities. AR 683. Plaintiff's overall RBANS score of 53 placed her in the 0.1 percentile, or "extremely low" range of functioning. AR 680. Plaintiff's performance on Trails A was normal, but her performance on Trails B was impaired, and she also performed poorly on the Clock Drawing Test. AR 679. On the M-FAST, Plaintiff's score of 9 indicates that she was prone to overstate the severity of her symptoms, but Dr. Franklin stated,

"[t]his may reflect that she is experiencing a significant and overwhelming level of distress. Based on the clinical judgment of this evaluator, she was generally telling the truth and putting forth adequate effort." AR 680.  On the Beck Anxiety and Depression Inventories, scores indicated Plaintiff was experiencing severe anxiety and severe depression, and Plaintiff endorsed a range of symptoms including a rapid alternation pattern of moods and auditory, visual, tactile, olfactory, and gustatory hallucinations.  AR 681, 683.

Dr. Franklin diagnosed Plaintiff with Unspecified Bipolar Disorder, Unspecified Psychotic Disorder, Somatization Disorder, and Borderline Intellectual Functioning.  AR 682.  Dr. Franklin determined Plaintiff has an extremely limited ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms, and a markedly limited ability to: maintain attention and concentration for two-hour segments; perform at a consistent pace; understand, remember, and carry out detailed instructions; and respond appropriately to changes in a routine work setting and deal with normal work stressors.  AR 684.

On August 28, 2014, Plaintiff underwent a physical evaluation with Maria Rivero, M.D. at the request of Plaintiff's representative.  AR 666.  Dr. Rivero conducted a physical examination and reviewed Dr. Von Buedingen's neurology consultation, a Kaiser ophthalmology consultation dated April 22, 2013, Kaiser records from 2013 to 2014, and a prior physical evaluation conducted by Dr. Emily Cohen on October 20, 2011.  AR 666.

Plaintiff told Dr. Rivero she cannot carry grocery bags, is unable to do laundry on her own, can only fold laundry for five minutes, has difficulty cooking due to ankle pain and trouble lifting pots, and experiences other difficulties completing activities of daily living.  AR 668-69.  On physical examination, Dr. Rivero noted Plaintiff was able to walk to and from the examination but slowly, shifted in her chair frequently, had no difficulty rising from seated position, but had moderate difficulty changing from supine to sitting.  AR 670.  Dr. Rivero reported Plaintiff had 5/5 muscle strength, but bilateral grip strength weakness, measured at 11.2 in her right hand (weak), and 5.8 in her left hand (weak).  AR 670, 672.  Plaintiff had less than normal range of motion in cervical flexion and extension, left lateral flexion, right lateral flexion, left rotation, right

6

rotation, lumbar flexion, hip flexion, foot inversion and eversion, and knee flexion. AR 672. She had normal range of motion in lumbar extension, elbow flexion and extension, wrist flexion and extension, hip extension, ankle plantarflexion and dorsiflexion, and knee extension. AR 671-72. Dr. Rivero noted tenderness to palpation in Plaintiff's bilateral jaw/masseter, right neck, upper back bilaterally, shoulder girdle bilaterally, upper arm bilaterally, lower arm bilaterally, hip/greater trochanter bilaterally, calf bilaterally, and ankle bilaterally. *Id.*

Dr. Rivero's clinical impression was that Plaintiff has Fibromyalgia by meeting American Rheumatologic Criteria with a total symptom score of 27, along with Cluster Headaches, Insomnia, Irritable Bowel Syndrome, Obstructive Sleep Apnea, Obesity, Depression and Anxiety; she ruled out Cerebellar disorder. AR 673. Dr. Rivero determined Plaintiff is limited to less than the full range of sedentary work, with the ability to lift or carry less than 10 pounds, stand or walk up to one hour a day with breaks every 15 minutes, and sit for up to 4 hours a day with breaks every 30 minutes, with additional exertional limitations and an inability to perform tasks requiring normal grip strength. *Id.*

On November 5, 2014, Dr. Rivero submitted an addendum explaining the American College of Rheumatology criteria for Fibromyalgia, and providing Plaintiff's scores on the various sub-parts, including the Widespread Pain Index, symptom severity scale, and durational requirement. AR 775-76.

**SOCIAL SECURITY ADMINISTRATION PROCEEDINGS**

Plaintiff filed a Title II claim for Social Security Disability Insurance ("SSDI") benefits on January 15, 2013, alleging an onset date of November 19, 2012. AR 340. Plaintiff's last-insured date for the purposes of eligibility for SSDI benefits is December 31, 2013. AR 301. Plaintiff filed a Title XVI claim for Supplemental Security Income ("SSI") benefits on January 29, 2013. AR 334. Both initial claims were denied on June 4, 2013. AR 262, 265. Plaintiff filed a timely request for reconsideration on July 26, 2013. AR 269. The claims were denied upon reconsideration on October 15, 2013. AR 272. Plaintiff filed a timely request for hearing on December 4, 2013. AR 279. A hearing was held on December 8, 2014, in Oakland, California

7

before Administrative Law Judge ("ALJ") Nancy Lisewski.  AR 33.  Plaintiff testified in person at the hearing and was represented by counsel, Kyle Kitson.  *Id.*  The ALJ also heard testimony from Vocational Expert ("VE") Joel Greenberg.  *Id.*

**A.     Plaintiff's Testimony**

The ALJ asked Plaintiff six questions.  AR 36-37.  The ALJ asked Plaintiff her age, current address, whether she lives alone or with other people, the ages of her children, whether she is currently working, and what keeps her from being able to work.  *Id.*  Plaintiff testified she is 30 years old and lives in Oakland with her husband and three children, ages 13, 9, and 3 years old.  AR 37.  She further testified she is not currently working and experiences pain throughout her body, lack of sleep, difficulty concentrating, and difficulty "gathering [her] emotions," which prevents her from working.  AR 37.  Upon questioning from her representative, Plaintiff elaborated she experiences headaches that can last all day, pain in her ankles for which she takes Naproxen and receives Cortisone shots, sharp pain in her hips, periodic "tingling" in her limbs, pain in her arms with use, difficulty controlling her wrist, gastrointestinal issues, vision issues including "floaters" and left eye twitching, and itchy, swelling skin.  AR 38-43.

Plaintiff testified she uses a cane two to three times a week for balance and a compression boot for her right foot, which she sometimes wears all day.  AR 44.  She further testified she is only able to walk a half block before she needs to stop and rest.  AR 44-45.  Plaintiff testified she has problems staying asleep, and wakes up constantly throughout the night, despite taking Melatonin.  AR 46.  She testified she is exhausted throughout the day, and sometimes has difficulty getting out of bed.  AR 47.

Plaintiff testified that she experiences anxiety, particularly about caring for her children.  AR 47.  She testified she relies on her husband for help a "tremendous amount" in caring for their children, and that her youngest son stays with his great grandmother most of the time.  AR 50-51.  Plaintiff testified she is only able to cook meals in the microwave due to past incidents burning her hands while cooking because of issues with depth perception and sensitivity to heat.  AR 51.  She testified she uses a chair in the shower due to dizzy spells, and that her daughter and her mother

help her do her hair.  AR 52.

Plaintiff testified she has seen therapists in the past, but that therapy caused her more anxiety.  AR 48.  She testified that as a patient at Kaiser Permanente, she sees a primary care physician, a neurologist, a gastroenterologist, an obstetrician, and an orthopedic doctor.  AR 53-54.  Plaintiff testified she does not go to Kaiser as frequently as she used to because of their inability to diagnose or effectively treat her symptoms, and that she had a particularly difficult relationship with her neurologist, who cut her off and questioned whether her symptoms were "in [her] head."  AR 53-55.

### B.  Vocational Expert's Testimony

The ALJ then took testimony from VE Joel Greenberg, who categorized Plaintiff's past work as childcare provider, Dictionary of Occupational Titles ("DOT") code 359.677-018,[1] and cashier, DOT code 211.462-010.[2]  AR 55-56.  The ALJ asked the VE two hypothetical questions.

---

[1] "NURSERY SCHOOL ATTENDANT (any industry) alternate titles: child-care leader; child-day-care center worker; day care worker. Organizes and leads activities of prekindergarten children in nursery schools or in playrooms operated for patrons of theaters, department stores, hotels, and similar organizations: Helps children remove outer garments. Organizes and participates in games, reads to children, and teaches them simple painting, drawing, handwork, songs, and similar activities. Directs children in eating, resting, and toileting. Helps children develop habits of caring for own clothing and picking up and putting away toys and books. Maintains discipline. May serve meals and refreshments to children and regulate rest periods. May assist in preparing food and cleaning quarters."

[2] "CASHIER II (clerical) alternate titles: cash clerk; cashier, general; cashier, office; ticket clerk. Receives cash from customers or employees in payment for goods or services and records amounts received: Recomputes or computes bill, itemized lists, and tickets showing amount due, using adding machine or cash register. Makes change, cashes checks, and issues receipts or tickets to customers. Records amounts received and prepares reports of transactions. Reads and records totals shown on cash register tape and verifies against cash on hand. May be required to know value and features of items for which money is received. May give cash refunds or issue credit memorandums to customers for returned merchandise. May operate ticket-dispensing machine. May operate cash register with peripheral electronic data processing equipment by passing individual price coded items across electronic scanner to record price, compile printed list, and display cost of customer purchase, tax, and rebates on monitor screen. May sell candy, cigarettes, gum, and gift certificates, and issue trading stamps. May be designated according to nature of establishment as Cafeteria Cashier (hotel & rest.); Cashier, Parking Lot (automotive ser.); Dining-Room Cashier (hotel & rest.); Service-Bar Cashier (hotel & rest.); Store Cashier (clerical); or according to type of account as Cashier, Credit (clerical); Cashier, Payments Received (clerical). May press numeric keys of computer corresponding to gasoline pump to reset meter on pump and to record amount of sale and be designated Cashier, Self-Service Gasoline (automotive ser.). May receive money, make change, and cash checks for sales personnel on same floor and be designated

In the first hypothetical, the ALJ asked the VE whether an individual of Plaintiff's age, education, and work background would be able to perform her past work or any other work if she was limited to simple, routine, light work with no more than occasional stooping, bending, kneeling, crouching, crawling, climbing, and occasional social contact. AR 56. The VE responded that such an individual would not be able to perform their past work, but could perform other work, including order caller, final inspector, and night cleaner, all with an 80 percent reduction in numbers. AR 56-57.

In the second hypothetical, the ALJ included the same limitations posed in the first hypothetical but added that the individual would be off-task at least 25 percent of the day. AR 57. The VE responded that no jobs would be available for such an individual. AR 57. Upon questioning from Plaintiff's representative, the VE testified that no jobs would be available if such an individual were off-task 15 percent of the workday. AR 57.

The VE further testified that an individual who is unable to complete a normal workday 10 percent of the time would not be employable. AR 58. The VE testified that an individual who is unable to respond appropriately to instructions and criticism from supervisors is unemployable. AR 59. The VE testified he could not think of any entry-level jobs for an individual who is unable to perform tasks requiring normal grip strength. AR 59. The VE testified that an individual who was consistently unable to respond appropriately to routine changes in a work setting is unemployable. AR 60.

At the conclusion of the hearing, Plaintiff's representative asked the ALJ whether she had any concerns about the record or discrepancies that needed to be resolved via further testing, given the differences between the functional assessments provided by the two examining psychologists. The ALJ responded that she would "review everything" and let Plaintiff know whether anything else was needed. AR 60.

---

Floor Cashier (clerical). May make change for patrons at places of amusement other than gambling establishments and be designated Change-Booth Cashier (amuse. & rec.)."

10

**C.     The ALJ's Findings**

The regulations promulgated by the Commissioner of Social Security provide for a five-step sequential analysis to determine whether a Social Security claimant is disabled.[3] 20 C.F.R. § 404.1520. The sequential inquiry is terminated when "a question is answered affirmatively or negatively in such a way that a decision can be made that a claimant is or is not disabled." *Pitzer v. Sullivan*, 908 F.2d 502, 504 (9th Cir. 1990). During the first four steps of this sequential inquiry, the claimant bears the burden of proof to demonstrate disability. *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 689 (9th Cir. 2009). At step five, the burden shifts to the Commissioner "to show that the claimant can do other kinds of work." *Id.* (quoting *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988) (citation omitted).

The ALJ must first determine whether the claimant is performing "substantial gainful activity," which would mandate that the claimant be found not disabled "regardless of medical condition, age, education, and work experience." 20 C.F.R. § 404.1520(a)(4)(i), (b). Here, the ALJ determined that Plaintiff had not performed substantial gainful activity since November 19, 2012. AR 15.

At step two, the ALJ must determine, based on medical findings, whether the claimant has a "severe" impairment or combination of impairments within the meaning of the Social Security Act. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.921. If no severe impairment is found, the claimant is not disabled. 20 C.F.R. § 404.1520(c). Here, the ALJ determined that Plaintiff had the following severe impairments: a Somatoform Disorder, Fibromyalgia, obesity, and a Bipolar Disorder. AR 15.

If the ALJ determines that the claimant has a severe impairment, the process proceeds to the third step, where the ALJ must determine whether the claimant has an impairment or combination of impairments that meet or equals an impairment listed in 20 C.F.R. Pt. 404, Subpt.

---

[3] Disability is "the inability to engage in any substantial gainful activity" because of a medical impairment which can result in death or "which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

11

P, App. 1 (the "Listing of Impairments"). 20 C.F.R. § 404.1520(a)(4)(iii). If a claimant's impairment either meets the listed criteria for the diagnosis or is medically equivalent to the criteria of the diagnosis, he is conclusively presumed to be disabled, "without considering age, education and work experience." 20 C.F.R. § 404.1520(d). Here, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that meets the listings. AR 15.

Before proceeding to step four, the ALJ must determine the claimant's Residual Functional Capacity ("RFC"). 20 C.F.R. § 404.1520(e). RFC refers to what an individual can do in a work setting, despite mental or physical limitations caused by impairments or related symptoms. 20 C.F.R. § 404.1545(a)(1). In assessing an individual's RFC, the ALJ must consider all of the claimant's medically determinable impairments, including the medically determinable impairments that are nonsevere. 20 C.F.R. § 404.1545(e). Here, the ALJ determined that Plaintiff has the RFC to perform light work as defined in 20 C.F.R. §§ 404.1567(b)[4] and 416.967(b), except for the following: "she is limited to occasional stooping, bending, kneeling, crouching, crawling and climbing; work should be simple and routine; she can have no more than occasional social contact." AR 17.

The fourth step of the evaluation process requires that the ALJ determine whether the claimant's RFC is sufficient to perform past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv); 404.1520(f). Past relevant work is work performed within the past 15 years that was substantial gainful activity, and that lasted long enough for the claimant to learn to do it. 20 C.F.R. § 404.1560(b)(1). If the claimant has the RFC to do his past relevant work, the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4)(iv). Here, the ALJ determined that Plaintiff could not

---

[4] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567(b).

12

perform past relevant work. AR 26.

In the fifth step of the analysis, the burden shifts to the Commissioner to prove that there are other jobs existing in significant numbers in the national economy which the claimant can perform consistent with the claimant's RFC, age, education, and work experience. 20 C.F.R. §§ 404.1520(g), 404.1560(c). The Commissioner can meet this burden by relying on the testimony of a vocational expert or by reference to the Medical-Vocational Guidelines at 20 C.F.R. Pt. 404, Subpt. P, App. 2. *Lounsburry v. Barnhart*, 468 F.3d 1111, 1114 (9th Cir. 2006). Here, based on the testimony of the vocational expert, Plaintiff's age, education, work experience, and RFC, the ALJ determined the following jobs existing in significant numbers in the national economy that Plaintiff can perform: Order Caller, DOT 209.667-014; Final Inspection, DOT 727.687-054; and Night Cleaner, DOT 381.687-014. AR 26-27.

### D.     ALJ's Decision and Plaintiff's Appeal

On February 25, 2015, the ALJ issued an unfavorable decision finding that Plaintiff was not disabled. AR 9. This decision became final when the Appeals Council declined to review it on October 14, 2015. AR 1. Having exhausted all administrative remedies, Plaintiff commenced this action for judicial review pursuant to 42 U.S.C. § 405(g). On March 11, 2016, Plaintiff filed the present Motion for Summary Judgment. On May 11, 2016, Defendant filed a Cross-Motion for Summary Judgment.

## LEGAL STANDARD

This Court has jurisdiction to review final decisions of the Commissioner pursuant to 42 U.S.C. § 405(g). The ALJ's decision must be affirmed if the findings are "supported by substantial evidence and if the [ALJ] applied the correct legal standards." *Holohan v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001) (citation omitted). "Substantial evidence means more than a scintilla but less than a preponderance" of evidence that "a reasonable person might accept as adequate to support a conclusion." *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002) (quoting *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995)). The court must consider "the administrative record as a whole, weighing the evidence that both

supports and detracts from the ALJ's conclusion." *McAllister v. Sullivan*, 888 F.2d 599, 602 (9th Cir. 1989) (citation omitted). However, "where the evidence is susceptible to more than one rational interpretation," "[the court] must uphold the ALJ's decision." *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989) (citation omitted). Determinations of credibility, resolution of conflicts in medical testimony, and all other ambiguities are to be resolved by the ALJ. *Id.*

Additionally, the harmless error rule applies where substantial evidence otherwise supports the ALJ's decision. *Curry v. Sullivan*, 925 F.2d 1127, 1131 (9th Cir. 1991). "[A court] may not reverse an ALJ's decision on account of an error that is harmless." *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) (citing *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1055-56 (9th Cir. 2006)). "'[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination.'" *Id.* (quoting *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009)).

## DISCUSSION

Plaintiff raises the following issues in her Motion: (1) whether the ALJ erred in evaluating the medical evidence; (2) whether the ALJ erred in failing to examine Plaintiff's prior file where it contained relevant, longitudinal evidence of her disability; (3) whether the ALJ erred in evaluating Plaintiff's credibility; and (4) whether the ALJ failed to consult a medical expert to determine whether Plaintiff meets or equals a Listing. Pl.'s Mot. at 2. Because the ALJ failed to fully develop the record, the Court only considers Plaintiff's second issue.

Plaintiff filed a prior claim for Title II and Title XVI benefits in March 2010, which was denied on June 5, 2012, after two hearings before ALJ Richard Laverdure. AR 156, 159. The Appeals Council denied Plaintiff's request for review of that decision on September 23, 2013. AR 254. The administrative record contains transcripts from both of these prior hearings, as well as ALJ Laverdure's unfavorable decision and the Appeals Council order denying review of his decision. AR 63-105, 106-55, 156-74, 254-59. However, the record does not contain the exhibits or medical evidence associated with this prior claim, consisting of Exhibits 1A through 21F as outlined in ALJ Laverdure's "List of Exhibits." AR 170-74. These exhibits included Kaiser

treatment records from July 23, 2009 to January 10, 2012; Highland Hospital treatment records from May 11, 2006 to September 14, 2009; Alta Bates Summit Medical Center treatment records from May 20 to May 27, 2009; correspondence from Plaintiff's husband dated February 21, 2012; two psychological reports from Ede Thomsen, Ph.D. dated May 15, 2010 and April 10, 2012; medical evidence from Emily Cohen, M.D. dated October 20, 2011; and a mental impairment questionnaire from Mandeep Kaur at Goals for Women, dated November 3, 2010. AR 173-74.

The ALJ references the prior claim and the prior hearing decision when determining whether Plaintiff had demonstrated "changed circumstances" for the subsequent claim. AR 15. In her decision, the ALJ states, "The claimant alleged that her symptoms began in 2009, however beyond an MRI performed in 2009, the record does not contain any medical evidence until January 2012," and states Plaintiff "first sought treatment for neurological symptoms at Kaiser with Neal Lischner, M.D. on January 10, 2012." AR 18.

While the ALJ references her prior claim, Plaintiff argues she did not actually review it. Pl.'s Mot. at 15. Plaintiff contends: "Even a superficial review of the prior ALJ decision" shows she sought treatment at Kaiser for a range of neurological symptoms in 2009, 2010, 2011, and 2012. *Id.* at 16; AR 164-65. Thus, Plaintiff argues the ALJ failed in her duty to fully and fairly develop the record. In response, Defendant argues: "There is no requirement that ALJ's [sic] incorporate all the evidence from prior decisions. Such a requirement would be both burdensome on the agency and courts of appeal, creating large records and transcripts with information that is not related or relevant to the period at issue in the present case." Def.'s Mot. at 16.

As set forth above, the regulations require that a claimant seeking disability benefits bears the burden of proving disability by providing evidence of medical impairments. 20 C.F.R. § 416.912(a), (c). However, "the ALJ has a special duty to develop the record fully and fairly and to ensure that the claimant's interests are considered, even when the claimant is represented by counsel." *Mayes v. Massanari*, 276 F.3d 453, 459 (9th Cir. 2001) (citations omitted). Thus, the Social Security Administration has its own responsibilities regarding obtaining evidence. Specifically:

15

> Before we make a determination that you are not disabled, we will develop your complete medical history for at least the 12 months preceding the month in which you file your application *unless there is a reason to believe that development of an earlier period is necessary* or unless you say that your disability began less than 12 months before you filed your application. We will make every reasonable effort to help you get medical reports from your own medical sources when you give us permission to request the reports.

20 C.F.R. § 416.912(d) (emphasis added); *see id.* § 416.945(a)(3) ("We will assess your residual functional capacity based on all of the relevant medical and other evidence. . . . [B]efore we make a determination that you are not disabled, we are responsible for developing your complete medical history, including . . . making every reasonable effort to help you get medical reports from your own medical sources."). When evaluating the degree of functional limitation for mental impairments, the SSA engages in "a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation" including "all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication, and other treatment." 20 C.F.R. § 404.1520a(c)(1); *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 1.

Here, the ALJ did not determine whether medical records associated with Plaintiff's prior claim in 2010 are directly relevant to obtaining this longitudinal picture. One of Plaintiff's diagnoses is a Somatoform Disorder, which the ALJ agreed is one of her severe impairments. AR 15. Somatic symptom and related disorders involve a persistent course of symptoms over a long duration that are commonly encountered in primary care rather than psychiatric settings. *See* Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition ("DSM-V") at 311. It does not appear the ALJ considered Plaintiff's treatment for neurological symptoms included with her prior claim, which means the ALJ possibly failed to consider evidence that is relevant to Plaintiff's somatoform disorder and overall degree of functional limitation. As such, there was "reason to believe that development of an earlier period [than the 12 months preceding the month in which Plaintiff filed her application] [wa]s necessary" before the ALJ could make a

16

determination regarding whether she was disabled.  20 C.F.R. § 416.912(d); *see also Kimmins v. Colvin*, 2013 WL 5513179, at *8-9 (N.D. Cal. 2013) ("Not only was the ALJ responsible for developing Kimmins' complete medical history (20 C.F.R. §§ 416.912(d) & 416.945(a)(3)), but the regulations explicitly require that that ALJ consider 'all relevant evidence to obtain a longitudinal picture of [a claimant's] overall degree of functional limitation' for mental impairments.  20 C.F.R. § 404.1520(a), (c)(1).  Medical records associated with Plaintiff's prior award in 2002 are directly relevant to obtaining this longitudinal picture.").

Further, under HALLEX section I-5-3-17, the hearing office will "associate the prior ALJ closed file" and maintain the subsequent application case file in Master Docket until the Appeals Council takes action if a request for review is pending, but upon notification of a denial/dismissal of the request for review, the hearing office will "associate the OHA SUBSEQUENT CLAIM FLAG showing the AC action with the pending subsequent application case file."  I-5-3-17 INSTRUCTIONS FOR PROCESSING SUBSEQUENT DISABILITY CLAIMS WHILE A PRIOR CLAIM IS PENDING REVIEW AT THE APPEALS COUNCIL, 2001 WL 34096370, at *3-4.  Here, it is not clear whether the hearing office was obligated to associate the entire prior case file or simply associate a subsequent case "flag," as Plaintiff initially filed the present claim while a review of her prior claim was pending with the Appeals Council, but the Appeals Council had ultimately denied Plaintiff's request for review by the time this subsequent claim proceeded to the hearing office.  AR 254, 279, 334.  Regardless, the circumstances of this case demanded that the ALJ review the longitudinal medical evidence associated with the prior file or, at a minimum, thoroughly review the summary of evidence cited in the ALJ's prior decision.  Indeed, Listing 12.00, Mental Disorders, explicitly articulates a need for longitudinal evidence of level of functioning:

> Need for longitudinal evidence. Your level of functioning may vary considerably over time. The level of your functioning at a specific time may seem relatively adequate or, conversely, rather poor. Proper evaluation of your impairment(s) must take into account any variations in the level of your functioning in arriving at a determination of severity over time. Thus, it is vital to obtain evidence from relevant sources over a sufficiently long period prior

17

to the date of adjudication to establish your impairment severity.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(D)(2).

As it is not before this Court, it is not clear whether the medical information underlying Plaintiff's prior claim would affect the ALJ's decision. However, at a minimum, it should have been considered by the ALJ. By not fully developing the record, the ALJ "effectively ignored potentially relevant medical evidence without giving specific, legitimate reasons for doing so. As such, the Court finds error was committed." *Kimmins*, 2013 WL 5513179, at \*9.

Because the yet-to-be considered evidence could affect other portions of the ALJ's decision, the Court declines to consider Plaintiff's remaining issues at this time.

## CONCLUSION

In reviewing a Social Security Commissioner's decision, a court may remand the case "either for additional evidence and findings or to award benefits." *Smolen*, 80 F.3d at 1292. Typically, when a court reverses an ALJ's decision, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004) (citations omitted). Moreover, "[r]emand for further proceedings is appropriate where there are outstanding issues that must be resolved before a disability determination can be made, and it is not clear from the record that the ALJ would be required to find the claimant disabled if all the evidence were properly evaluated." *Taylor v. Comm'r of Soc. Sec.*, 659 F.3d 1228, 1235 (9th Cir. 2011) (reversing and remanding for the consideration of new evidence instead of awarding benefits).

The Court concludes this case should be remanded for further administrative proceedings so the ALJ can consider the medical evidence associated with Plaintiff's prior claim. *See Harman v. Apfel*, 211 F.3d 1172, 1180 (9th Cir. 2000) ("Because neither the ALJ nor the vocational expert had the full picture before them, remand for further proceedings is particularly appropriate."). In addition, because this evidence may affect other portions of the decision, the ALJ shall determine if any further evaluation is required based on the issues Plaintiff raises here.

For these reasons, and because the ALJ failed to fully and fairly develop the record when

18

evaluating Plaintiff's disability claim, the Court **GRANTS IN PART** Plaintiff's Motion for Summary Judgment, **DENIES** Defendant's Cross-Motion for Summary Judgment, and **REVERSES** the ALJ's decision.  This case is **REMANDED** for further administrative proceedings in accordance with this Order.

**IT IS SO ORDERED.**

Dated: **July 15, 2016**

_____
MARIA-ELENA JAMES
United States Magistrate Judge

19